## Richmond

VERNON LEE FISH v. COMMONWEALTH OF VIRGINIA.

April 22, 1968.

Record Nos. 6718, 6719.

Present, All the Justices.

*Arnold H. Leon (Bangel, Bangel and Bangel, on brief)*, for plaintiff in error.

*Richard N. Harris, Assistant Attorney General (Robert Y. Button, Attorney General, on brief)*, for defendant in error.

CARRICO, J., delivered the opinion of the court.

Vernon Lee Fish, the defendant, was convicted by the trial court, sitting without a jury, of two offenses of malicious wounding (Code, § 18.1-65), which were tried together. He was sentenced to serve a term of three years in the penitentiary upon each conviction, the sentences to run concurrently. He was granted writs of error to the final judgments of conviction.

The defendant's convictions arose out of an occurrence which took place on a public street in the city of Portsmouth on the night of

June 20, 1966. The defendant, while occupying the rear seat of an automobile, twice fired a shotgun from a side window of the vehicle, one shot striking Henry M. Harris, Jr., and the other striking Susie Henderson, both of whom were standing at a bus stop on the sidewalk.

The defendant admitted firing the shots, but denied that he intended to hit the injured parties, intending instead, according to him, to fire into the air to frighten another person who had thrown a bottle and had shot at the car in which he was seated.

At the trial, the Commonwealth called to the witness stand Joanne Gordon, an acquaintance of the defendant. Miss Gordon testified on direct examination that she saw the defendant on the night in question, and that he told her "he had been out shooting some colored people." Miss Gordon further testified that the defendant told her "he shot these persons" because a friend of his "had got beat up by some colored people." She was asked if the defendant had told her "what his intentions were when he shot at these people." She replied, "To kill."

On cross-examination, Miss Gordon was asked several times by L. David Lindauer, the defendant's retained counsel, if she had testified at the preliminary hearing that the defendant had told her that he had shot at the injured parties with intent to kill them. On each occasion, Miss Gordon replied, "I don't recall" or "I don't remember." She was warned by defense counsel that he would "produce witnesses to show that [she] did not make such a statement" at the preliminary hearing.

At the conclusion of the Commonwealth's case, the defendant moved to strike the evidence. The motion was denied. Mr. Lindauer, the defendant's counsel, then advised the court that he had thought that certain police officers had heard Miss Gordon testify at the preliminary hearing and would be able to contradict the testimony given by her at the trial. He had ascertained, however, Mr. Lindauer stated, that the witnesses were sequestered at the preliminary hearing, and the officers were not in the courtroom when Miss Gordon testified. Lindauer therefore moved that he be permitted to withdraw as counsel so that he could become a witness for the defendant. He also moved that the defendant be given "the opportunity to obtain other counsel."

After a discussion of the problem, the court ruled that it would permit the defense "to proceed to put on all the contradictory evidence," and if Mr. Lindauer then still wished to take the stand, the court would consider his motion.

The defendant was then called as a witness in his own behalf. He testified to the occurrences on the night of the shooting and denied that he had told Miss Gordon that he had intended to kill anyone. He also stated that Miss Gordon had not testified at the preliminary hearing that he had told her he intended "to kill some colored people."

After the defendant had testified, Mr. Lindauer told the court, "The defendant does not wish to offer anything further at this time other than the motion that counsel has previously made." The trial court stated: "It is my understanding that . . . you wish to testify . . . relative to the statements made at the preliminary hearing. . . . I think that is proper, and I will grant your motion. Then, after you have testified, you can resume your position as counsel for the defendant."

The court inquired of the defendant personally if he wished his counsel to testify as a witness and if, while counsel was testifying, he would agree to be "momentarily deprived of counsel." The defendant expressed his assent to both inquiries.

Mr. Lindauer then took the witness stand and testified concerning the statements made by Miss Gordon at the preliminary hearing. He said that she did not there testify that the defendant "had gone out to shoot colored people, nor kill anyone." Instead, Lindauer stated, Miss Gordon's "whole testimony" at the preliminary hearing "was the fact that [the defendant] shot up in the air."

The record shows that after Mr. Lindauer had testified, the trial court "advised counsel . . . and counsel agreed with it, that it would not be proper for him to take part in the case further and argue same, and as an officer of the court and having testified, he would be in an embarrassing position of arguing his own statement to the Court." The record further shows that the court "then suggested that another member of the firm could present all the argument, or the defendant could argue the case in his own behalf, if he wished to do so."

The court then recognized Arnold Leon "as coming in and taking over for Mr. Lindauer as counsel" for the defendant. Mr. Leon was associated with the same law firm as Mr. Lindauer, and apparently had been called to the courtroom following a luncheon recess.

Mr. Leon informed the court that his "first appearance in the case was after adjournment when the Court reconvened the case just a few minutes ago." He said that he understood his function was "to come in at this stage of the trial and attempt to argue facts secondhand, after being given a brief summation of the case."

Mr. Leon moved for a mistrial, stating that "to bring a new counsel

in at this stage is denying the defendant the right to have counsel throughout the trial, which certainly includes the argument of the case." Leon further said that he did not believe that the defendant understood "that Mr. Lindauer would not be able to argue the case when he agreed to . . . sit by himself while Mr. Lindauer took the stand."

The court overruled the motion for a mistrial. The Commonwealth's Attorney then waived argument, and Mr. Leon proceeded to argue the case according to what he termed "my understanding" of what the testimony had been. The Commonwealth's Attorney replied to the defendant's argument. The court then stated that it felt that "its viewpoint of the evidence would be the same, regardless of argument of counsel" and that Miss Gordon's testimony stood unimpeached. The court proceeded to find the defendant guilty of the charges against him. The defendant's motion for a new trial was overruled.

The sole question to be decided is whether the defendant is entitled to a new trial because of the procedure followed in the trial court relative to the withdrawal and substitution of counsel.

We have not been presented previously with just such a situation as we have before us, nor have we been able to find where any other appellate court has dealt with a like problem.

The lack of case authority results, no doubt, from the fact that it is a rare occasion which necessitates that counsel leave his role as advocate and become a witness in the same proceeding. The rarity of such an occasion results, in turn, from the admonitory language of Canon 19 of the Canons of Professional Ethics, 205 Va. 1012, at 1017, which reads as follows:

> "When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in Court in behalf of his client."

Although Canon 19 frowns upon the practice of counsel becoming a witness in behalf of his client, it sometimes happens during the course of trial that the exigencies of the situation require such action—where, in the words of the canon, it is "essential to the ends of justice." We do not inquire into the question of whether such a situation existed in this case. Mr. Lindauer obviously thought it did exist, and

the trial court manifestly agreed with him because the court ruled that it was "proper" for Mr. Lindauer to testify in behalf of the defendant.

While the operation of Canon 19 may be the reason that no case authority has been found, the canon itself does supply, at least in part, the answer to the problem presented in this case. The canon requires that when it becomes necessary for counsel to take the witness stand in behalf of his client, he shall withdraw and "leave the trial of the case to other counsel."

Since there is the requirement upon counsel to request permission to withdraw and upon withdrawal to "leave the trial of the case to other counsel," there surely must be a reciprocal duty upon the court trying the case to permit such withdrawal, if it believes the request to be in good faith, and to afford the client reasonable opportunity to secure "other counsel."

It is apparent that the trial court and Mr. Lindauer attempted to observe the spirit of Canon 19 when the situation developed where Mr. Lindauer thought it necessary for him to testify in behalf of the defendant. But they both misconceived the letter of the canon in assuming that Lindauer could "momentarily" withdraw as counsel while testifying, and in supposing that after he had testified, it would be proper for him to "resume [his] position as counsel for the defendant."

When the effect of that misconception was realized, the court ruled, "and counsel agreed with it," that it would not be proper for Mr. Lindauer "to take part in the case further and argue same." The court attempted to rectify the situation by "suggesting" that another member of Lindauer's firm "could present all the argument, or the defendant could argue the case in his own behalf, if he wished to do so."

It was then that Mr. Leon was called to the courtroom. On short notice and with no more preparation than "a brief summation," he was required, over his objections, to present closing argument according to his "understanding" of what the testimony had been.

We are of opinion that it was error for the trial court to permit Mr. Lindauer to withdraw only "momentarily" as counsel for the defendant while testifying as a witness and, then, when it realized its mistake, to require other counsel, not chosen or agreed to by the defendant, to present final argument on such short notice and with such little time for preparation. We believe that when it was determined that it was necessary and proper for Lindauer to withdraw,

his withdrawal should have been made final and complete; and the defendant should have been given reasonable opportunity to secure other, independent counsel. Only by that course could both the letter and the spirit of Canon 19 have been respected.

Thus, the canon answers the problem before us to the extent that it points to the error in the procedure followed in the trial court. It does not necessarily answer, however, the Commonwealth's contention that because Mr. Leon's argument "was excellent" and because the trial court stated that its viewpoint would not have been changed by argument, the defendant "was not prejudiced by the events which transpired in the court below."

We have read Mr. Leon's argument with care and hesitate to append an adjective to it. We doubt, however, that an argument may be termed "excellent" when its important statements begin with expressions like "It is my understanding" or "I understand," and when counsel is forced to admit, in discussing a witness whose crucial testimony may have been contradicted, "I don't know her name."

The answer to the Commonwealth's contention that the defendant was not prejudiced because the court's viewpoint would not have been changed by argument is found in the early case of *Word* v. *The Commonwealth*, 3 Leigh (30 Va.) 743 (1831), involving a charge of "unlawfully gaming at cards." The trial court had refused to allow counsel for the accused to argue the case upon the evidence before the jury for the reason that "the evidence [was] all on the side of the Commonwealth, and [was] unimpeached, and the court [was] of opinion, that it [was] clear and distinct as to the fact charged, and [could not] be varied by argument of counsel."

On appeal, the General Court held that although a trial court may exercise "a proper control over the course of the argument," yet:

"It is the right of every party accused to be heard by counsel on his whole case. . . . [T]he right of the accused to be heard on his whole case, involves directly the right to be heard on the credibility of the evidence against him. The fact that the evidence is direct to the point in issue, and must establish that point or not, according as the evidence is credible or not, even though coupled with the fact that there is no direct evidence to impeach its credit, does not alter the principle, or present a case to which the principle cannot apply. . . . [T]his right would be utterly destroyed, if it were allowed to the court to prohibit argument, merely because, *in its opinion*, the

evidence is so clear that argument cannot vary it. . . ." 3 Leigh (30 Va.), at 759-760. [Emphasis from text.]

Thus, it is seen that argument is an integral part of a criminal proceeding; and even though the evidence may point to but one conclusion and may be unimpeached, such circumstances do not alter the principle that an accused is entitled to be heard in argument. That view, established in the *Word* case, involving a mere misdemeanor where the Commonwealth's evidence was uncontradicted, ought to apply with greater force where, as here, the charge involved is a serious felony and the crucial testimony of a key Commonwealth witness is claimed to be impeached.

Such a view is not changed by the fact that this case was tried before the court, sitting without a jury. Whether Miss Gordon's testimony was or was not impeached involved the determination of an important question of fact; and the resolution of that issue may well have affected the outcome of the serious legal question of whether there was or was not sufficient evidence of the defendant's essential intent, in shooting the injured parties, "to maim, disfigure, disable, or kill." (Code, § 18.1-65.)

If the defendant had a right to be heard in argument upon these crucial questions, he was entitled to all the advantages which the exercise of that right in the hands of well-prepared, independent counsel might have accorded him, whether or not the court's ultimate viewpoint of the evidence was changed thereby.

The right of argument, if not waived, is entitled to protection, regardless of the possible result to be achieved by argument. Since the defendant here was not fully accorded that right and did not waive it, the judgments appealed from will be reversed, and the cases remanded for a new trial.

*Reversed and remanded.*